## ADJUDGED IN THE

# SUPREME COURT OF JUDICATURE

### OF THE

## STATE OF NEW YORK,

IN JANUARY TERM, IN THE YEAR 1799.

---

### SETON, MAITLAND & Co. *against* LOW.

In an action on a policy of insurance, from New York to the Havana on " *all kinds of lawful goods* laden," &c. it was held, that articles contraband of war, were lawful goods, within the meaning of the policy ; that goods not prohibited by the positive law of the country to which the vessel belongs, are lawful ; and that the insured are not bound to disclose to the insurer, that the goods insured are contraband of war. (*a*)

*Benson,* J. dissented.

A neutral nation is under no moral obligation to abandon or abridge its trade, in consequence of war between two others—yet a belligerent may seize and confiscate contraband goods upon the principle of self-defence. Per *Kent,* J.

It is a general and a just principle that every fact in the knowledge of the assured which enhances the ordinary risk and which would if disclosed enhance the premium, ought to be communicated to the underwriters. But the principle is limited to circumstances which the underwriter is not presumed to know nor bound know. Per *Kent,* J.

THIS was an action on an open policy of insurance, dated the 3d of May, 1797, upon "*all kinds of lawful goods and merchandizes,*" on board the brig Hannah, from New York to the Havana. The sum of 16,000 dollars was subscribed by the defendant, as President of the United Insurance Company, at a premium of eight per cent. The insurance was averred to have been made for the benefit

(*a*) *Skidmore & Skidmore* v. *Desdoity; infra,* vol. 2, p. 77. *Juhel* v. *Rhinelander,* id. 120. S. C. in error, id. 487.

of Manuel Galbore De Silva, and the loss stated to have been by capture, by his Britannic Majesty's sloop of war the Swallow.

The action was tried before Mr. Justice *Hobart*, at the circuit, held in the city of New York, when a verdict was found for the plaintiffs, for the sum of 15,405 dollars, [*2] *subject to the opinion of the court, on the following case.

The plaintiffs, on the 2d day of May, 1797, wrote to the company, whereof the defendant was president, the following note: " The company will please to effect insurance on the brig Hannah, W. R. M'Colley, master, from New York to the Havana, viz. 4000 dollars on the vessel out and home, valued at the sum of     , and 16,000 dollars on the cargo, *not warranted,* but shipped by and in the name of their obedient humble servants, *Seton, Maitland & Co.*"

On receiving this order, the policy was effected, for the sum and at the premium therein mentioned. No disclosure was made to the company, at the time of obtaining the insurance, of the nature of the cargo, nor who was the owner, nor were any questions asked by the insurers on those points. The plaintiffs and defendant resided in New York. One of the plaintiffs, William M. Seton, was a member of the company. On the 17th of March, 1797, the governor of the Havana, by proclamation, permitted the following articles to be imported into that place, in *American* vessels, of which description was the Hannah, namely, all kinds of eatables, (except cod fish and flour,) Britannias, Creas, ticklenberghs, platillas, Russia duck, checks, twine, nails and cordage. The plaintiffs, pursuant to the above mentioned proclamation, obtained a written permission from the consul of his Catholic Majesty for the state of New York, signed the 5th of May, 1797, for the captain of the said brig to proceed from New York to the Havana, with her cargo, and the permit enumerated every article of which the cargo consised. The cargo of the Hannah belonged to the said Manuel Galbore de Silva, a Spanish subject, and consisted of the following articles: viz. Britannias, Silesia,

Creas, ravens duck, ticklenberghs, platillas, Russia duck, Russia sheeting, cordage, ratlines, checks and twine. The Hannah was captured, and carried into New Providence, where the cargo was libelled, and a decree *pronounced by the court of the vice admiralty, "condemning, as lawful prize, the ravens duck, ticklenberghs, Russia duck, cordage, ratlines and twine, as being shipped by the plaintiffs, citizens of the United States, contrary to their neutrality, and the treaty of amity, commerce and navigation, between Great Britain and the United States, and as being articles contraband of war, and such as may serve for the equipment of vessels, and as by the said treaty are declared to be just objects of confiscation, whenever attempted to be carried to an enemy." And with respect to the remaining cargo on board, the judge of the said court decreed as follows : " From the peculiarity of the marks, the initial letters of the consignee and of Manuel Galbore de Silva, a Spanish passenger on board the said vessel, who was lost overboard, and more especially from the direct contradiction in the examinations, on oath, of William Reynolds, M'Colley, the master, and John Millholland, the mate of the said brigantine, the former declaring that, to the best of his knowledge, they belong to Messrs. Seton & Maitland, merchants in New York, and citizens of the United States of America, that he believes the said cargo did, at the time of shipping, and will, if landed in the Havana, become their property, and that the said passenger had no concern or property whatever in the said vessel and cargo, and the latter, as positively declaring, that he imagines the whole cargo belonged to the said Spanish passenger, a partner of the said consignee, as he had been informed by the said master, and which opinion is supported by Messrs. Maitland, Howell & Co. ship chandlers, coming on board the said vessel, to get pay for some outlandish cordage, sold to the said passenger by them, and on which he had received the drawback, and that he believes the said goods, if landed in the Havana, would really belong to, and become the property of the said passenger and consignee ; wherefore, I am doubtful who are the real, true and absolute owners of the said last mentioned

[*3]

goods; I do, therefore, further decree, that one hun-
[*4] dred days from the *date hereof (which was the 7th
of July, 1797) be allowed the said Seton, Maitland &
Co. to prove their real, true and absolute property in the
aforesaid goods, last enumerated, to the satisfaction of this
court; and that on the claimant giving good and sufficient
security for the appraised value of the said goods, and to
abide the final decree of the said court, respecting the said
goods, the same to be delivered up to the said claimant; and,
lastly, I condemn the claimant in the costs occasioned by
the interposition of his claim."

The plaintiffs, on receiving intelligence of the capture
and proceedings above mentioned, or shortly thereafter, to
wit, on the 22d day of August last, abandoned to the com-
pany, the cargo, and delivered to them the usual proofs of
interest and loss. It was admitted that the articles which
were condemned as contraband of war, were the cause of
the capture and detention. The whole property on board,
including commissions and premiums of insurance, amount-
ed to 15,388 dollars and 88 cents. It was also admitted,
that ticklenberghs do not usually serve for the equipment of
vessels, although, from necessity, sails are sometimes made
of them.

The points which were stated in the case by the counsel,
were as follows: 1. Whether the plaintiffs were entitled
to recover for a total loss? If the court should be of that
opinion, judgment should be entered on the verdict, as it
stood.

2. Whether the plaintiffs were entitled to recover only
for the goods which were not condemned as contraband of
war, and under this head, whether the ticklenberghs were
properly condemned as such? If the court should be of
opinion, that the plaintiffs were entitled to recover for the
articles last mentioned, and also for the ticklenberghs, as
not being contraband, and being improperly condemned as
such, then a verdict should be entered for the sum of 8497
dollars, and six cents costs, and judgment accordingly. But
if the court should be of opinion, that the ticklenberghs were
justly condemned as contraband of war, and that the plain-

tiffs *were entitled to recover only for the articles [*5] which were not condemned as such, then the verdict was to be entered for the sum of 6804 dollars, and six cents costs, and judgment accordingly.

3. If the court should be of opinion, that the plaintiffs were not entitled to recover any part of the sum insured, that then the judgment should be entered for the defendant.

KENT, J. Two questions were raised, on the argument in this case.

1. Whether the contraband goods were lawful, within the meaning of the policy.

2. If lawful, whether the assured were bound to disclose to the defendant the fact, that part of the cargo was contraband of war.

On the first point, I am of opinion, that the contraband goods were lawful goods, and that whatever is not prohibited to be exported, by the positive law of the country, is lawful. It may be said, that the law of nations is part of the municipal law of the land, and that by that law, (and which, so far as it concerns the present question, is expressly incorporated into our treaty of commerce with Great Britain,) contraband trade is prohibited to neutrals, and, consequently, unlawful. This reasoning is not destitute of force, but the fact is, that the law of nations does not declare the trade to be unlawful. It only authorizes the seizure of the contraband articles by the belligerent powers; and this it does from necessity. A neutral nation has nothing to do with the war, and is under no moral obligation to abandon or abridge its trade; and yet, at the same time, from the law of necessity, as Vattel observes, the powers at war have a right to seize and confiscate the contraband goods, and this they may do from the principle of self-defence. The right of the hostile power to seize, this same very moral and correct writer continues to observe, does not destroy the right of the neutral to transport. They are rights which may, at times, reciprocally clash and injure each other. But this collision is the effect of inevitable necessity, and the neutral has no just cause to complain. A trade by a neutral, in articles contraband of

[*6]　　*war, is, therefore, a lawful trade, though a trade, from necessity, subject to inconvenience and loss.(a)

With respect to the second question, the reason of the rule requiring due disclosure of all facts, within the knowledge of either party, is to prevent fraud, and encourage good faith. It is a principle of universal law, and applicable to all contracts, that every material ingredient in the contract must be disclosed and made known to both parties, otherwise, they make a contract different from the one they intended. There are, however, certain circumstances, appertaining to every contract, which each party is presumed to know, and need not be told. In making a contract of insurance, it was laid down by the English court of K. B. in the case of *Carter* v. *Boehm*, (3 Burr. 1905,) that the underwriter is bound to know any cause which may occasion natural perils, as the season of the year, the peculiar danger of the voyage, from its course, the prevalent winds, and the like. He is, also, bound to know what may occasion *political* perils, as the state of war between states, and the various operations of war. If an underwriter insure a private ship of war, he need not be told of secret expeditions, &c. for he is bound to know, that such are the presumed destinations of such vessels. All matters of general notoriety and speculation, every party is bound to know, at his own peril. These principles I have kept in

---

(a) Mr. Phillips in his Treatise on the law of Insurance, intimates that the trading in articles contraband of war is illegal by the law of nations which forms part of the municipal law of every state ; and that the property cannot therefore be the lawful subject of insurance even in a neutral state. Phillips on Insurance (1st ed.) 39, but the doctrine of the text is supported by Vattel B. 3 c. 7, sec. 111, and adhered to by Chancellor Kent in his Commentaries, vol. 3, p. 267, 268, and vol. I. p. 142.

In *Pond* v. *Smith*, 4 Conn. Rep. 297, a trade by a neutral in goods contraband of war was held not to be illegal, therefore a demand arising out of a voyage from the United States the object of which was to sell the cargo, consisting of fire arms and munitions of war to either of two belligerent powers with whom the United States were at peace, or to any other persons was held not to be illegal, although such cargo was undoubtedly contraband of war and liable to confiscation by either of the belligerent powers. See also the judgment of Ch. Justice Parsons in *Richardson* v. *Maine F. & M. Ins. Co.* 6 Mass. Rep. 102, 114, 115. See also the *Santissima Trinidad and the St. Andre,* 7 Wheaton, 283, and *Barker* v. *Blakes*, 9 East, 283.

view, and brought into application, in my reflections on the present case.

An American underwriter, we will suppose, subscribes a policy on a foreign voyage, in a time of profound peace, and he regulates the premium accordingly. It then happens, that a war breaks out between the United States and Spain, for instance, and he is called upon again to underwrite. The risk, undoubtedly, is greatly enhanced, because the United States are now *a party in the war*, but this is a fact of public notoriety, a political peril, which the underwriter is presumed to know, and it need not be disclosed to him. We will suppose, however, that instead of a war between the United States and Spain, a war *breaks out between Spain and   [*7] some other power in Europe. This is a fact, also, of a public nature, which need not be told. The underwriter is presumed to know it and its consequences, in relation to the trade of his own country, as well as to that of all others.

The United States are not now a party to the war. A new and different relation, or character, arises, the character of a *neutral power*. In the one case, the trade of the United States is greatly exposed by the depredations of its enemy : in the other case, its trade is in a much less, though in some degree, exposed by the interfering rights of the belligerent powers. But in the one case as well as in the other, the insurer is presumed to know, and to contemplate the risk, because it is a peril inevitably arising from the state of war.

A war between foreign powers, as I have already observed forms no lawful impediment to the universality of the neutral trade. The neutral may carry on his customary trade as before, without discrimination. The law does not infer, and the insurer has no right to infer, a diminution, or abridgment, of the neutral trade, in consequence of a foreign war, because, the neutral is under no moral or legal obligation to abridge it. The presumption will be, that the neutral trades, as usual, without any regard to the *accidental* circumstances of a war abroad, and without rejecting any part of his *customary* cargo, though a certain species of it, under the description of *articles contraband of war*, is exposed to seizure,

by-coming in collision with certain rights of necessity created by the war. Underwriters are to presume the trade to be in its unfettered state, and to take the risk of the interfering rights I have mentioned. As in the former case of a war, in which the United States are a party, the assured can always diminish the premium consequent on the extraordinary risk, by a warranty that the property is neutral; so, in the latter case, of a war abroad, increasing, by necessary consequence, the risk in a smaller degree, the assured can always diminish the premium attached to such increased risk, and [*8] *reduce it to the standard of a peace premium, by a warranty that the cargo is not contraband of war.

It is a general and a just principle, that every fact, in the knowledge of the assured, which enhances the ordinary risk, and which would, if disclosed, enhance the premium, ought to be communicated to the underwriters.(a) But the prin-

(a) Concealment consists in the suppression of any fact or circumstance material to the risk, or that can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy, or at what premium he will underwrite it, and equally avoids the contract, whether it be the effect of fraud, negligence, accident or mistake, (though it be a mere rumor or report, which afterwards turns out to be false. *Lynch* v. *Hamilton,* 3 Taunt. 37. *Lynch* v. *Dunsford,* 13 East, 494.) *Carter* v. *Boehm,* 1 W. Black. 594. Burr. 1909. Marshall on Insurance, 465. *Fillis* v. *Brulton,* Park on Insurance, 292. *Thompson* v. *Buchanan,* 4 Bro. P. C. 482. *Elton* v. *Larkins,* cited *infra.* *Stetson* v. *Mass. Ins. Co.,* 4 Mass. R. 330. *Curry* v. *Commonwealth,* 10 Pick. R. 535. *Bryant* v. *Ocean Insurance Co.* 22 Pick. 200. *Oliver* v. *Greene,* 3 Mass. R. 133. · *Stocker* v. *Merrimac Ins. Co.,* 6 Mass. R. 220. *Fletcher* v. *Commonwealth Ins. Co.,* 18 Pick. R. 419. *Ely* v. *Hallett,* 2 Caines' R. 57. *Howell* v. *Cin. Ins. Co.,* 7 Ohio R. 276. The underwriter is not bound to inquire into facts which he may suppose material to the risk. *Baxter* v. *The New England Ins. Co.,* 3 Mason C. C. R. 96. But the insured is bound to disclose to him, all circumstances which may throw the smallest light on the nature and perils of the proposed adventure, with the most unreserved *candor and frankness. Himely* v. *So. Ca. Ins. Co.,* 1 M. Con. Rep. 154. Though mere silence concerning a material fact known to the insurer, or legally presumed to be within his knowledge, if no inquiry is made is not concealment to avoid the policy. *Green* v. *Merchant's Ins. Co.,* 10 Pick. 402. Thus in effecting a policy, a circumstance of intelligence inserted in Lloyd's lists need not be communicated to the underwriters, however important it may be to the computation of the risk. For it is to be presumed within their knowledge, and to be taken into account. *Friere* v. *Woodhouse,* Holt, 572. And see *McAndrew* v. *Bell,* 1 Esp. 373. See however, *Sawtell* v. *Loudon,*

ciple is limited to circumstances, which the underwriter is not presumed to know, nor bound to know; and if my reasoning be good, the underwriter is presumed to know that the neutral trade undergoes no abridgment, or abandonment, in war; that it is likely to consist of the same kind of articles in war as in peace, and, consequently, that the nature of the cargo need not be disclosed.

There is an ingredient in the present case, which ought to be noticed, as deserving of consideration.

The cargo was shipped to the Havana, in consequence of a proclamation of the governor of that place, enumerating certain articles by name, (and of which articles the present cargo consisted) which might be imported in American bottoms. This proclamation was a public act, materially affecting the American trade, and it may be inferred, that it was publicly known. If that be the case, we can hardly presume otherwise than that the defendants in this suit must have known, and need not to have been told, that the cargo of the Hannah consisted of particular articles enumerated in the proclamation.

My opinion, accordingly is, that judgment be rendered

5 Taunt. 359; 1 Marsh. 99. But the announcement in the foreign lists filed at Lloyds, of the sailing of a ship out of the port from which she is insured, does not, when such communication is material, dispense with the assured's disclosing a letter received from his captain before the policy is effected, announcing the day of his intended departure. *Elton* v. *Larkins*, 8 Bing. 198; 1 M. & Scott, 323; 5 Carr. & Payne, 86, 385. What facts within the knowledge of the assured are material, is matter for the jury exclusively to determine. *N. Y. Fire Ins. Co.* v. *Welden*, 12 Johns. R. 16. S. C. in error, id. 513. *Livingston* v. *The Maryland Ins. Co.*, 6 Cranch, 274. *Richards* v. *Murdock*, 10 B. & C. 527. *Fletcher* v. *Commonwealth Ins. Co.*, 10 Pick. R. 535. *Ingraham* v. *So. Ca. Ins. Co.*, 1 Tr. Con. Rep., 707. Though where a policy was effected on the 3d of November, on the ship G., which had sailed with the ship F., on the 10th of October previously, which latter had, with the underwriter's knowledge, arrived some few days before; but, the insured did not communicate the fact that the G. and F. had parted company in a gale on the 21st October. The court granted a new trial, although the jury had found that the fact was not a material one. *Westbury* v. *Aberdein*, 2 Mees. & Welsb. 267. The opinion of underwriters, whether upon certain facts being communicated to them, they would have insured or not the particular voyage may be received as evidence. *Richards* v. *Murdock*, cited above, S. P. *Contra*, *Durrell* v. *Bederley*, Holt, 283.

for the plaintiffs as for a total loss ;(a) yet in a question so important to the interest of trade, in respect to which, I have. met with no pertinent decision in the English law, I regret that I cannot give this opinion, without some hesitation and difficulty, and I could have wished, that the usage and understanding of merchants, on the subject of this kind of disclosure, had been found, and thrown into the case.

LEWIS, J. The grounds of opposition to the claim of the plaintiffs are :

[*9] *1st. That the assured were engaged in a commerce illicit by the treaty of amity, commerce and navigation, between the United States and Great Britain.

2d. That the circumstance of the goods being contraband, ought to have been disclosed to the underwriters.

The recovery, if any, must, in my opinion, be for a total loss; for if the plaintiffs are barred on either of these grounds, it will go to the whole policy ; and if they are insufficient, the voyage having been totally defeated, and an abandondment made, the plaintiffs must recover the whole amount insured.

According to Grotius and Bynkershoeck, instruments of war are alone considered as contraband of war by the general maritime law of nations; and when going to a port blockaded, or a place besieged, are liable to confiscation, upon the principle of its being illegal to supply a belligerent power, with articles useful only in war. But by the ordinances of France of 1543 and 1584, and by those of several other commercial countries of Europe, they are to be paid for when they are the property of a neutral. Great Britain, in the reign of Queen Elizabeth, also recognized this principle. Hence the idea of illegality has, in more modern times been exploded, and the doctrine of the present day appears to be, that the only effect of a capture and condemnation is, that the neutral power, by demanding compensation, would avow itself a party to the war. Articles declared contraband

(a) Barker v. Beakes, 9 East, 283. See also, Mullett v. Shedden, 13 id. 304.

by particular convention, fall, *a fortiori*, under the same rule. The ordinances of different maritime nations, from whence this law is deduced, are founded in principles of policy adapted to the particular interests of each. America has none, but surely her courts of justice have a right to adopt such as will operate most favorably to her. The treaty with Great Britain is, unquestionably, the law of the land, but it by no means follows from thence, that the exportation of articles contraband within its letter, is illegal, in such a sense as to render an insurance on them void. Were we to give it *that construction, similar treaties with [*10] the different European powers, would annihilate our commerce ; for as it embraces all our principal exports, the merchant would be reduced to the necessity of becoming his own insurer, and no capitals in the country would be adequate to the support of such a mercantile system. Nor do the terms *lawful goods*, introduced into the policy, in my opinion, in any wise alter the case ; for I cannot consider them as having relation to the acquired rights of any foreign country. If they have any particular reference, it must be to the local law of this country. Much reliance has been placed on the authorities cited from Valin, Emerigon and Pothier, but they do not apply to the case.

They treat of the validity of an insurance on goods, the exportation and importation of which are forbidden by the laws of foreign countries, a point settled both in England and France in favor of its validity ; Valin and Emerigon, subscribing to such decision, while Pothier is of a different opinion. I do not think, therefore, that on the ground of illegality, the underwriters are discharged. (See Marshall, 48—55.)

The next question is, whether the assured were bound to disclose the nature of the cargo ; and on this point, I confess, I have had greater doubts than on the other. It was assumed as a position by the defendant's counsel, that the underwriters were not bound to inquire, but that the assured were bound to disclose every circumstance that had a tendency to enhance the risk : But I find this principle no where adopted, except so far as relates to extrinsic circumstances.

Were it to extend beyond these, surely among the many adjudications in the English courts, something of the kind would be met with, but it is admitted that no such case is to be found. It may then be fairly inferred, that the principle does not exist. Indeed, it would be highly injurious to that nation, for it would destroy all foreign insurance, which has become to her, and probably will be to us, an important source of commercial profit. When nations are at war, underwriters contemplate captures by the belligerent [*11] powers, and take premiums adequate *to every risk. Where they wish to avoid the hazard of any particular risk, they guard against it in the policy. Thus we find warranties introduced for their protection; nor has the argument that, had the insurers known the nature of the cargo, they would, probably, have demanded a higher premium, any weight with me. We are to suppose they contemplated every usual risk; though, probably, had the nature of the cargo been disclosed to them, and been found to consist of articles not contraband by treaty, they might have demanded a less premium. It is a settled principle, that the assured are not bound to disclose what the assurer waives to be informed of, or ought to know. Here was a vessel bound to a port with which we had not a free trade. The voyage was undertaken, in consequence of a permission granted by a proclamation of the governor of Havana, with which all mercantile men, it must be presumed, were acquainted.

The cargo consisted of the very articles to which the permission extended, certain species of provisions excepted; here then was sufficient to have put the insurers on their guard, and if they did not choose to inquire, it is presumable that they intended to take the risk. If the doctrine of disclosure is to be extended to the nature of the cargo of a vessel, where are we to stop? Must it not take place in every instance? The risks will be as various as the commodities that are exported. Gunpowder, liquors, oils, saltpetre, money and jewels, are subject to greater risks than provisions, yet it never has been held, that a disclosure of such articles was necessary. It may, also be a question, in the present instance, whether there was an increased risk. The

property was refused to be warranted neutral; the infe-rence, therefore, was that it was enemy's, and no circum-stance could increase the risk of capture. The flimsy covering of a shipment in the name of a neutral, con-sidering the cupidity for capture that has distinguished all the belligerent powers, has never, I suspect, proved a pro-tection.

*My opinion therefore is, that the law on both points,   [\*12] is, with the plaintiffs, that they are entitled to re-cover for a total loss.

LANSING, Ch. J. I have considered the objections on the part of the defendant, to rest on these grounds;

1st. That the concealment of the circumstance that part of the cargo was contraband of war, enhanced the risk and vitiated the policy.

2d. That this was a contract against the policy of the law, and, therefore, void.

3d. That the treaty with Great Britain, which was the supreme law of the land, inhibited the citizens of the Uni-ted States, from furnishing the enemies of that kingdom with articles contraband of war.

It may be useful to examine, as to the first point, what species of articles are comprehended under the general terms of "all kinds of lawful goods and merchandises."

On the argument, no authorities were introduced which have any intimate connection with the subject. The rea-soning on the question, was from general principles respect-ing the nature of contraband goods; but no instances of the particular application of those cases, even remotely analo-gous to the present, were given. Whether the articles al-leged to be contraband of war, were of a nature to require a particular specification, may be collected from the idea, which, by common usage, is intended to be conveyed, by the terms lawful merchandise.

In Magens, (p. 9, § 13,) it is laid down, " that every per-son, making insurance, under the general expression of " merchandise," ought not to conceal any thing he may know to deserve a greater premium, than is generally given; and for any damage, happening to goods more liable to it than others,

insured at a low premium, the insurer ought not to be answerable, any further than in common with the rest of the cargo, not subject to damage."

In sect. 14, he observes, " according to the laws of several places, such things, as in their nature are soon corrup-

[*13]    tible and perishable, or *contraband goods*, which, *in time of war are liable to confiscation, are not to be understood, under the general expression of merchandises." He then declares, " that the ancient ordinances of insurance, made at Amsterdam and Middleburgh, allow corn, fruits, and a number of other perishable articles, and ammunition, to be comprehended under that expression, but that those of the city of Rotterdam, in 1721, of Amsterdam in 1744, and the French, Hamburgh and Prussian ordinances, require particular specifications of certain articles, as not comprehended under the general expression of merchandise.    Among these, we generally find ammunition, and other articles contraband of war.

These specifications appear to have varied with the motives which dictated them, so as to present them subject to a more extended or restricted rule, and forcibly lead to the opinion, that, independent of such particular regulations, no such exceptions would exist.

The authorities which have been cited in the course of the argument, to show the effect of a concealment of material circumstances, resting in the knowledge of the assured, appear to me not to apply to the case.    They have, I take it, no relation to the quality of the merchandise ; the term merchandise comprising every species of goods of whatever quality. If this be so, the assurer, in estimating the risk he insures against, demands a premium, in every instance, for the greater risk, leaving it to the insured, by a discovery of the precise nature and quality of the merchandise, and, by correspondent stipulations, to diminish the risk, and reduce the premium. The insurers in this case knew the destination of the goods, and that the vessel, on board of which they were embarked, was bound for the Havana, a place belonging to one of the belligerent powers.    They knew that the goods were shipped by, and in the name of the plaintiffs, and the note, in consequence of which the insurance was made, contained an inti-

mation, calculated to put the insurers on their guard. It mentioned, that the insured would not submit to a warranty, and the insurers, also, probably knew, that in conse- quence of the *proclamation of the governor of the [*14] Havana, the articles which were actually shipped, were alone permitted to be imported there. With all this knowledge, no inquiries were made, but the policy was un- derwritten, as it appears, merely on the application of the plaintiffs.

But it has been alleged, that this insurance is against the policy of the law, and also, that it is inconsistent with our treaty with Great Britain. Without examining the extent of this principle, it will be sufficient to observe, that the British treaty does not impose any new obligation on the citizens of the United States, to refrain from exporting articles contra- band of war. It merely defines the objects which shall be considered as such, in cases implicating the interests of the contracting parties, and leaves the general law of nations to its operation in regard to the interception of such articles, on their way to an enemy's port.

By the law of nations, articles contraband of war, if the utmost extent of the doctrine be applied to this case, are liable to confiscation, when intercepted by the subjects of any of the nations at war, on the way to the ports of their enemies; but there were no restraints on the exportation of these articles from the United States, and certainly none could exist at the port of destination, as the proclamation was evidently intend- ed to invite importations, and the property insured, appears to have belonged to a Spanish subject.

In a nation like our own, engaged in extensive commer- cial enterprises, in which every foreigner may export, in any vessel of the United States, without restriction as to the ob- jects of exportation, the mere circumstance of the policy be- ing intended to attach to a vessel, sailing from a port in those states, in my opinion, could not create a presumption, that the property insured was American, or authorise any infe- rence to that effect. The policy might, for aught the insurers knew, or could infer, from the natural course of the transac- tion, have applied wholly to goods, the property of the

[*15]    subjects of the king *of Spain; as the fact appears to have been in the present case : And a circumstance, to afford some color for a presumption of that kind was, that the vessel was actually destined for a Spanish port. Upon the whole, as far as I have been enable to investigate the principles applicable to this case, and from my reflections on their tendency, I am of opinion, that this was a valid policy, as respected the goods, contraband of war ; that it was not necessary to inform the insurers of the species of articles intended to be insured ; and that the proper mode of guarding against the risk of including articles of this description, in policies of insurance, is to require stipulations from the insured, that none such shall be comprised in the cargo to be insured. I am, therefore, of opinion, that the plaintiffs are entitled to recover for a total loss.

BENSON, J. *dissented,* on the ground, that the insured ought to have disclosed the nature of the goods, or that they were contraband.

RADCLIFF, J. not having heard the argument of the cause, gave no opinion.

Judgment for the plaintiffs.(a)

*B. Livingston* and *Hoffman,* for the plaintiffs.
*Harison* and *Hamilton,* for the defendant.

(a) In consequence of the above decision the following clause was added to the policies of insurance used in New York: "It is also agreed, that the property be warranted by the assured, free from any charge, damage or loss, which may arise in consequence of a seizure or detention for or on account of any illicit or prohibited trade, or any trade in articles contraband of war."

In the case of *Mayne* v. *Walter,* (Park, 196, Marshall, 356 ;) Lord Mansfield, and the court decided, that the insured need not disclose, that the ship had an English supercargo on board ; though, by a French ordinance, the ship was condemned for that reason. In *Long* v. *Duff,* (2 Bos. & Pull. 209,) Lord Eldon left it to the jury to decide, whether, according to the usage of merchants, it was the duty of the insurer, to satisfy himself, whether the vessel was foreign built, and, therefore, not entitled to be registered, nor bound to sail with convoy. Though this greatly increased the risk, yet, the jury found that it was not incumbent on the insured, to communicate the fact to the insurer, and the court of common pleas decided, that the point was properly left to the jury. (Marshall, 353—356.) But Pothier (Trait. du Contrat d'Assur. 196,) is of opinion, that the insured cannot, in conscience, be silent as to a fact which he knows, and which, if known to the insurer, would have considerably increased the premium.