## THE CITY OF MEXICO.[1]

*(District Court, S. D. New York. May 11, 1885.)*

FORFEITURE—BREACH OF NEUTRALITY LAWS—REV. ST. § 5283—TRADE WITH
BELLIGERENTS—LAW OF NATIONS.

The steamer City of M. was chartered to a reputable merchant at New York
to carry some arms and munitions of war from New York to the port of Sav-
anilla, United States of Colombia, in fulfillment of an order for them from
a merchant at Baranquilla. She also took lumber and specie to procure a re-
turn cargo of fruit for another New York merchant from Bocas del Toro. Sav-
anilla was at the time in the possession of insurgents against the regular govern-
ment of the state of Bolivar, to whom belligerent rights had been accorded.
The warlike material was probably intended for their use, as an agent of the in-
surgent government brought the order and aided in expediting the business.
After arriving at Savanilla and delivering this part of the cargo, the captain of
the City of M. contracted with the insurgents to transport about 250 passengers
from Savanilla to Rio Hacha. The latter port was in possession of the regular
government; but it appeared that the captain was informed and believed that it
was held, like Savanilla, by the insurgents. About 150 passengers came aboard
under this contract, who turned out to be soldiers of the insurgent government.
When the steamer arrived at Rio Hacha, the collector of the port and some of
his men came along-side the steamer and were seized by the soldiers, against
the earnest remonstrance of the captain and officers of the City of M. The
following morning an armed schooner, belonging to the lawful government,
was descried at a distance, to capture which the insurgents attempted to make
use of the City of M., but abandoned the project on the solemn protest of the
captain, officers, and crew of the steamer, the chief engineer refusing to work
the ship, and thereupon the captain steamed immediately to Savanilla, where
the *de facto* government disavowed the acts of the soldiers, and the collector
and his men were released. On the return of the City of M. to New York, pro-
ceedings were had to forfeit her for violating the neutrality laws, on the ground
that she had been fitted out for the purpose of committing hostilities against a
state with which the United States were at peace. Rev. St. § 5283. The court
found that the trip from Savanilla to Rio Hacha was not intended when the ves-
sel left New York. *Held*, that section 5283 prohibits warlike or hostile voyages
only,—not commercial ventures; that the carrying of arms for the use of a
belligerent to a port in its possession is not against our municipal law or the
law of nations, but merely subjects vessel and goods to search and seizure by
the other belligerent; that the voyage of the City of M. from New York was
purely commercial and peaceable in intention; that the trip to Rio Hacha was
an independent diversion undertaken by the captain on his own responsibility,
and, whether hostile in intent or not, was not within section 5283, because not
planned "within the limits of the United States;" that the shipment, moreover,
being made on the order of a Baranquilla merchant, and no evidence appear-
ing that he was not the immediate principal, the transaction could not be
treated as one directly with the insurgents; and that, in either view, neither the
shipment of arms from New York, nor the independent diversion by the captain
in the trip to Rio Hacha, infringed section 5283, and the vessel was accordingly
discharged.

In Admiralty.

*Elihu Root*, for the United States.

*W. W. MacFarland*, for the steamer.

BROWN, J. On the twenty-fifth of April, 1885, the libel of infor-
mation in this case was filed for the forfeiture and condemnation of
the steam-ship City of Mexico, for an alleged violation of the neu-

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

trality laws of the United States, as enacted by section 3 of the act of April 20, 1818, (3 St. at Large, 448,) now section 5283 of the Revised Statutes. Briefly stated, the alleged offense consisted in carrying military supplies for the insurgent government at Savanilla, and there taking on board about 150 armed soldiers and proceeding thence to the loyal seaport of Rio Hacha, upon a hostile military expedition, during which the custom-house officers who boarded the ship at Rio Hacha were captured and brought back to Savanilla.

The steamer having been seized, and having remained without bonding in the custody of the government, the cause has been brought to immediate trial. Section 5283 provides for the forfeiture of every vessel fitted out or armed, "within the limits of the United States, with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or any colony, district, or people, with whom the United States are at peace."

The libel, in eight different counts, varying somewhat in form, charges, in substance, that the steamer, on or about the twelfth day of March, 1885, within the Southern district of New York, was fitted out with intent that she should be employed in the service of certain rebels, citizens of the United States of Colombia, then in insurrection against the United States of Colombia, to cruise and commit hostilities against the subjects, citizens, and property of the latter, with whom the United States were at peace. Some of the counts state that the alleged rebels then constituted a *de facto* government at the city and district of Baranquilla and Savanilla. The answer consists of a general-denial.

The proofs show that during some months previous to the seizure of the steamer an insurrection had existed in the state of Bolivar, one of the states of the United States of Colombia, of which Baranquilla was the interior capital, and Savanilla, about 30 miles distant, was the seaport; that the insurgents were in possession of these cities, had established a *de facto* government there, and that the recognition of belligerent rights had been accorded them by the lawful government of that country, and a notification thereof made to our government on the twelfth of March, 1885. On the same day, the steamer City of Mexico, of about 660 tons, sailed from New York with a cargo consisting of 20 cases of guns, 50 cases of cartridges, 50 boxes of builders' hardware, 300 barrels of flour, 100 hemlock boards, 50 spruce scantlings, and two boxes containing $1,540 in specie. The hardware, as well as the guns and cartridges, were military supplies consigned to Perez & Co., merchants at Baranquilla, upon whose account and order they had been purchased shortly before in this city by S. P. Triana, an established and reputable commission merchant here. The order for the goods and the funds to pay for them were brought from Baranquilla by one Gaitan, who was in fact a com-

missioned agent of the insurgent *de facto* government, and who was actively engaged here in expediting the purchase and the forwarding of these military supplies as quickly as possible. Endeavors were first made to send them by the Atlas Steam-ship Company, a line running between New York and the West Indies, which sometimes sends vessels directly to Savanilla, and sometimes forwarded goods thither by transhipment from Jamaica. Mr. Williams, the superintendent of that line, on being applied to, finding that he would have no vessel available that would not involve a delay of some two or three weeks in the shipment, introduced Mr. Triana to Messrs. Lord & Austin, the managers of the Provincial Steam-ship Company, a line ordinarily running between New York and Halifax, but which then had a spare steamer. They were informed by Mr. Triana that he desired to ship these military supplies to Perez & Co., Baranquilla, at once. Thereupon, on the fifth of March, a charter of affreightment of the City of Mexico was executed by Lord & Austin to Mr. Triana, for a voyage to Savanilla and back for the sum of $5,000, prepaid. The charter provided for four lay days at Savanilla, and $200 per day demurrage for any detention beyond that; that if homeward freight could be obtained from any port in South America, or the West Indies, to the United States or Canada, the charterers were to have one-half of the net freight; that the steamer was to carry to Savanilla two passengers for account of the charterers free of charge, who were to obtain the permission of the customs authorities at Savanilla to land the cargo; that on failure to obtain such a permit within the lay days named, the master was to proceed to Kingston and land the cargo, or bring it back to New York; and that in the event of any detention of the vessel by the authorities at New York that should prevent her sailing, the charter was to be canceled, and $2,500 was to be returned to the charterers.

Before the vessel sailed an arrangement was effected to procure for the return voyage a fruit cargo for a house in New York from Bocas del Toro. That port is about 500 miles to the westward of Savanilla. The specie, scantling, and boards, part of the cargo shipped at New York, as above stated, were for the purchase and binning of the fruit to be obtained at Bocas del Toro.

The steamer sailed in the afternoon of the twelfth of March, arrived without incident off Savanilla on the 21st, commenced discharging that night upon lighters, and finished without any impediment at half-past 2 P. M. of the following day. The master on the same day went to Baranquilla and deposited the ship's papers with the American consul there. The next day Capt. O'Brien was introduced by Perez & Co., his consignees, to some agent or officer of the insurgent government, and on the twenty-fifth of March he made a contract with him by which he agreed "to take on board the steamer about 250 passengers, to be conveyed and landed at Rio Hacha, for the sum of $400, and 100 tons of ballast to be put on board the

steamer, and a pilot provided; the time not to exceed three or four days." Under this contract, on Friday, the 27th, about 150 troops, with arms and military officers, were put aboard from a tug-boat; but, the necessary water and provisions not being supplied, the steamer did not leave Savanilla until the following day. Rio Hacha was at that time in the peaceable possession of the loyal government. It was from 150 to 200 miles from Savanilla, a trip of about 24 hours for the City of Mexico. Capt. O'Brien testifies that he was assured by Perez & Co., before leaving Savanilla, that Rio Hacha was in the possession of the insurgent party. The American consul at Baranquilla, on the 26th, gave Capt. O'Brien a clearance for Rio Hacha. The steamer arrived off Rio Hacha in the afternoon of the 29th, and came to anchor in shallow water about a mile and a half from land. At 7:40 P. M. the custom-house boat came along-side, containing the collector of the port and six other persons. The collector, on boarding the steamer, was seized by the direction of the general of the troops; and the other men in the small boat were compelled, by rifles pointed at them, to come on deck, when they were all put under guard by the troops, and the boat also was taken aboard. This proceeding was against the earnest remonstrance of Capt. O'Brien and the officers of the ship, who protested without avail. They lay off the port till daylight, when a schooner, said to be armed and to belong to the lawful government, being descried at a distance, the general and troops demanded that the steamer should be used to capture her, and seemed determined to take possession of the steamer for that purpose. The insurgent pilot sided with the general and the troops; but the captain, officers, and crew of the steamer all solemnly protested against the proposed attack of the schooner as an act of piracy under the American flag; and the chief engineer refusing to work the ship, the project was abandoned, though not without much excitement and illtemper on the part of the general. Capt. O'Brien thereupon steamed towards Savanilla, where he arrived on the next morning, having on the way stopped for a few hours at Santa Marta, at the urgent desire of the general, to whose wishes it was deemed politic to this extent to defer. On arrival, the captain entered his formal protest before the American consul at Baranquilla. The *de facto* government disavowed the acts of the general and troops in making prisoners of the collector and his men, and declared that punishment should be inflicted for the offense; and the prisoners were released and sent back. On the first of April the steamer cleared for Bocas del Toro, where she arrived on the 4th, obtained a partial cargo of fruit, and then sailed for New York, where she arrived April 17th.

Does a voyage of such character infringe the provisions of section 5283 of the Revised Statutes above referred to? The offense under that act, it will be observed, is confined to cases in which the vessel shall be fitted out, etc., "with intent that she shall be employed to *cruise* or *commit hostilities*," etc. The expedition from Savanilla to

Rio Hacha, though anomalous and inexplicable in some of its features, was doubtless a hostile expedition in the intention of the insurgents; though there is no explanation in the evidence of what its plans were, and it accomplished nothing but the absurd and treacherous seizure of a few custom-house officials, who innocently boarded the steamer in the discharge of their duties. The captain's agreement was that "passengers" were to be taken aboard and landed at Rio Hacha; but the general and 150 soldiers, who came aboard as passengers, when they arrived off Rio Hacha, were not landed. They had not, apparently, any means of landing, nor any disposition to land; and the next morning their only anxiety seemed to be to appropriate the steamer to their use in an attempt to capture the distant schooner.

There is not sufficient evidence before me to determine properly to what extent Capt. O'Brien, in making the contract at Baranquilla to carry the 250 passengers to Rio Hacha, was chargeable with knowledge of its military and hostile character. There is nothing to contradict his testimony that he was assured and believed that Rio Hacha was in the possession of the insurgents, and that he had no idea of any use of his vessel other than as a peaceable transport. If it be said that Capt. O'Brien ought to have known, or to have ascertained, whether Rio Hacha was actually in possession of the insurgents or not, some allowance is certainly due to him from the fact that he was not accustomed to trade in that region, and that the political *status* of the provinces and cities of that coast is neither so stable nor so notorious that a captain, not having previous dealings with them, should have known their political affiliations. Some inferential support of his testimony may, perhaps, be found in the fact that the American consul at Baranquilla gave him a clearance for that port; although the whole force of this inference would be broken if it should appear, as may have been the fact, that the consul had no knowledge of the purpose of the trip. If Capt. O'Brien had no knowledge that any military demonstration was intended, but contracted only to transport insurgent troops from one port in their possession to another port supposed by him to be in their own possession, wholly unconnected with any particular military enterprise, it is certain that he committed no offense against our municipal law, and no offense even against the law of nations, save to subject his ship to capture by the other belligerents if caught during the voyage. But, however this may be, the contract to carry troops to Rio Hacha was not made "within the limits of the United States." It is only against designs formed within these limits that our statute is directed. Upon this trial, therefore, the Rio Hacha excursion has no importance, except in two respects: *First*, in case it was designed in this country; and, *secondly*, as regards the light, if any, that it may shed upon the general intent with which the ship was fitted out in New York.

There is no evidence that Rio Hacha formed any part of the orig-

inal destination of the ship. Nothing in the charter, or in the preparations in New York, countenances such an hypothesis. Every indication is to the contrary. The direction of the captain to observe the orders of the two passengers has evident relation only to the landing of the cargo of military supplies, concerning which there was ground for such precautions, because the supplies were liable to capture. There is no evidence and nothing to warrant the inference that the ship was designed, when she left New York, to be placed in the service of the insurgents after the landing of the military supplies at Savanilla. And the comparatively moderate compensation agreed on for the Rio Hacha trip, and the complete absence from the steamer of every kind of armament, forbid the assumption that the captain either intended to incur, or expected to incur, any of the hazards of a military enterprise. It was shown, moreover, that the diversion of steamers to transport troops upon short voyages like this was not uncommon upon that coast. The trip was expected to occupy but three or four days. The compensation was liberal, considered as an ordinary and peaceable commercial adventure, but preposterously low as a diversion of the steamer to a military and hostile use. The sequel, also, does not show any circumstances that Capt. O'Brien could be reasonably presumed to have been able to foresee, or to expect, that should have deterred him from accepting such a contract for transportation as a mercantile venture in behalf of his owners. The testimony of McCarthy, the first officer, so far as it tends to incriminate the captain, is not only opposed to the weight of other testimony, but is plainly inconsistent with, if not directly contradicted by, McCarthy's entries in the log kept by himself.

I must regard the excursion to Rio Hacha, therefore, as wholly disconnected from the fitting out of the vessel in New York, and as affording no ground for a proceeding against the ship under our municipal law, which has reference solely to plans formed and completed in this country. So strictly in that respect is the statute in question construed, that in the case of *U. S.* v. *Quincy,* 6 Pet. 445, the supreme court held that "the intention with respect to the employment of the vessel should be formed before she leaves the United States; and this must be a *fixed* intention." Accordingly, in that case, where the defendant was indicted for fitting out the Bolivar as a privateer at Baltimore, the court held that instructions should have been given to the jury that if, "when the Bolivar was fitted and equipped at Baltimore, the owner and equipper intended to go to the West Indies in search of funds with which to arm and equip the said vessel, and had no present intention of using or employing the said vessel as a privateer, but intended, when he equipped her, to go to the West Indies to endeavor to raise funds to prepare her for a cruise, then the defendant is not guilty;" also, "that if the jury believe that when the Bolivar was equipped at Baltimore, and when she left the United States the equipper had no fixed intention to employ her as a pri-

vatccr, but had a wish so to employ her, the fulfillment of which wish depended on his ability to obtain funds in the West Indies for the purpose of arming and preparing her for war, then the defendant is not guilty." The Rio Hacha episode in this case was far more completely independent of any fixed intention of wrong-doing at the time the vessel sailed, than was the Bolivar's cruise when she left Baltimore.

In its other relations, the Rio Hacha incident, as one of the results of the interview between Capt. O'Brien and Perez & Co., the ostensible consignees of the military supplies at Baranquilla, does tend to give support to the inference which numerous other circumstances also indicate, viz., that these supplies were ordered for the direct and immediate use of the insurgent forces at Savanilla and Baranquilla; and that the insurgent government was probably the beneficial purchaser, acting through Perez & Co., as its agents only. On the latter point, however, there is no certain proof. It may be assumed that the military supplies were designed for the immediate use of the troops there, and that Gaitan, as agent of the *de facto* government, came to New York in its behalf to expedite as rapidly as possible the obtaining and shipping of these supplies. But it would not follow that because the insurgent government, as between it and Perez & Co., was the real principal, that Perez & Co., who ordered the supplies, can be ignored; or that Mr. Triana, in New York, in acting upon and filling the orders of Perez & Co., his supposed principals, and in shipping the goods to them from this port, is to be treated as dealing directly with the insurgent government. He has a right to stand upon the contract according to its form, because its form in such case is material. A contract of this kind stamps the transaction, so far as our own citizens are concerned, as a commercial venture only; because it is strictly and wholly, so far as our citizens are concerned, a purchase and shipment by one merchant here, upon the order and for the account of another merchant abroad. I do not include cases where the use of a foreign merchant's name by a belligerent is known to be a mere sham. But there is not sufficient evidence here to sustain that theory. All that can be legitimately inferred is that the supplies were intended for the immediate use of the insurgent government through the consignment to Perez & Co., and upon their order. The fact that Gaitan was in constant communication with Mr. Triana, and that he directed all the important arrangements for the dispatch of the goods, warrants that inference; but that is not enough, against Mr. Triana's testimony, to sustain the charge that the supplies were furnished directly to the insurgent government.

The case turns upon the construction to be given to the language of section 5283. The counsel for the government contends that, in substance, the steamer was engaged as a *transport* in the service of the insurgent government; and that she was fitted out in New York,

as such a transport, to carry military supplies upon account of the insurgent government, and for its use and benefit. It is urged that to carry supplies for one belligerent, and to engage in his transport service, is to take part in his military operations, and is, consequently, to "commit hostilities" against the other belligerent. It is, doubtless, true that, according to the established rules of international law, the transportation of stores and military supplies, even by a neutral, subjects them to capture and confiscation as prize by the other belligerent, (*The Commercen*, 1 Wheat. 382; *The Friendship*, 6 C. Rob. 420; *The Orozembo*, Id. 430; *The Carolina*, 4 C. Rob. 256;) and if the vessel herself is in the direct employ of a belligerent, she also, on capture, will be liable to condemnation.

It is impossible, however, to hold, in this case, that the City of Mexico was in the employ of the insurgent government or in its possession. She was never out of the possession of the Provincial Steamboat Company, her owners. She was not chartered to the insurgent government, nor to any of its representatives, but to Mr. Triana, a merchant of this city; and the charter itself was but a charter of affreightment for an outward voyage, and was manifestly for no other purpose than a commercial venture to carry these military supplies to Savanilla, for the ultimate use, it may be conceded, of the insurgent government, and thence to proceed to Bocas del Toro, to obtain cargo for her return voyage. But even if Perez & Co. were to be ignored, and the charter were treated as a charter for the delivery of the supplies directly to the insurgent government, it would have been none the less a commercial venture only. The law of nations does not prohibit the citizens of neutral states from carrying supplies, even contraband of war, to either belligerent; although those that engage in it run the risk of search, capture, and confiscation. Neither our laws, nor our treaties forbid such traffic.

Mr. Webster, in his letter to Mr. Thompson of July 8, 1842, upon this subject, observes:

"It is not the practice of nations to undertake to prohibit their own subjects, by previous laws, from trafficking in articles contraband of war. Such trade is carried on at the risk of those engaged in it, under the liabilities and penalties prescribed by the law of nations or particular treaties. If it be true, therefore, that citizens of the United States have been engaged in a commerce by which Texas, an enemy of Mexico, has been supplied with arms and munitions of war, the government of the United States, nevertheless, was not bound to prevent it,—could not have prevented it without a manifest departure from the principles of neutrality,—and is in no way answerable for the consequences. The eighteenth article (of the treaty between the United States and Mexico) enumerates those commodities which shall be regarded as contraband of war; but neither that article nor any other imposes on either nation any duty of preventing, by previous regulation, commerce in such articles. Such commerce is left to its ordinary fate according to the law of nations." Lawrence's Wheat. Internat. Law, 813, note 232; 6 Webst. Works. 452; Hall, Internat. Law, 70; *Seton* v. *Low*, 1 Johns. Cas. 1.

Mr. Layard, in the English house of commons in 1862, said:

"The law of nations exposes such persons to have their ships seized and their goods taken and subjected to confiscation; and it further deprives them of the right to look to the government of their own country for any protection. And this principle of non-interference in things which the law does not enable the government to deal with, so far from being a violation of the duty of neutrality, is in accordance with all the principles which have been laid down by jurists, and more especially by the great jurists of the United States of America."

Mr. Marcy, in his dispatch to Mr. Buchanan of April 13, 1854, (Cong. Doc. 33d Cong. 1st Sess. H. R. Doc. 103, p. 21,) says:

"As the law has been declared by the decisions of the courts of admiralty and elementary writers, it allows belligerents to search neutral vessels for articles contraband of war and for enemies' goods. If the doctrine is so modified as to except from seizure and confiscation enemies' property under a neutral flag, still the right to seize articles contraband of war, on board of neutral vessels, implies the right to ascertain the character of the cargo. A persistent resistance by a neutral vessel to submit to a search renders it confiscable, according to the settled determination of the English admiralty."

President Pierce, also, in his message to the first session of the thirty-fourth congress, speaking of articles contraband of war, says:

"The laws of the United States do not forbid their citizens to sell to either of the belligerent powers articles contraband of war, or take munitions of war or soldiers on board their private ships for transportation; and although in so doing the individual citizen exposes his property or person to some of the hazards of war, his acts do not involve any breach of national neutrality, nor of themselves implicate the government."

Kent, in his Commentaries, vol. 1, p. 142, sets it down as the established law that "neutrals may lawfully sell at home to a belligerent purchaser, or carry themselves to the belligerent powers, contraband articles subject to the right of seizure *in transitu*." And that "the right of neutrals to transport, and of the hostile power to seize, are conflicting rights, and neither party can charge the other with a criminal act." *The Santissima Trinidad*, 7 Wheat. 283, 340; *Richardson* v. *Maine Ins. Co.* 6 Mass. 113.

The provisions of section 5283, and of the neutrality act of 1818, are not directed against commercial adventures, nor against peaceable aid, however important, rendered by our citizens to either belligerent, so long as such aid arises indirectly only through commercial dealings, and in the ordinary channels of trade. The statute is directed solely against warlike enterprises. It does not forbid giving aid and comfort to either belligerent. Had that been its design it would have been expressed. Its language is: "To *cruise* or *commit hostilities* against the subjects, citizens, or property,".etc. This plainly means acts of force, injury, or destruction, that are of a warlike character, as distinguished from the peaceable interchanges of commerce, which, however much they may indirectly aid a belligerent, involve no hostilities committed or participated in by the ship herself. If a vessel should engage to take part as a transport in a hostile expedition, she might be held to be involved in the general

design of the expedition, and in the intent to commit hostilities.   But
no intent of that kind is possibly attributable to the City of Mexico
on fitting out from New York.   And it is this "fixed intent" on her
departure from this country that is alone material.   Her designs
were purely peaceful.

In the case of *U. S.* v. *Quincy,* 6 Pet. 466, above quoted, the court
say:

"The intention is the material point on which the legality or criminality
of the act must turn, and decides whether the adventure is of a commercial
or warlike character.   The law does not prohibit armed vessels, belonging to
the citizens of the United States, from sailing out of our ports, and it only re-
quires the owners to give security that such vessels shall not be employed by
them to commit hostilities against foreign powers at peace with the United
States.   The collectors are not authorized to detain vessels, although mani-
festly built for warlike purposes, and about to depart from the United States,
unless circumstances shall render it probable that such vessels are intended
to be employed by the owners to commit hostilities against some foreign
power at peace with the United States.   All the latitude necessary for com-
mercial purposes is given to our citizens, and they are *restrained only from
such acts as are calculated to involve the country in war.*"

The voyage of the City of Mexico appears to me, beyond con-
troversy, to have been intended to be wholly peaceable.   She was,
in all respects, in men and in equipment, in the same condition as
upon her customary voyages, without armament of any sort.   The
port of Savanilla was in the undisputed, peaceful possession of the
insurgents.  There was no blockade, or attempted blockade, of it by
the lawful government.   The sole object of the owners of the ship,
who remained all the time in possession of her, was to deliver these
military supplies at Savanilla.   There was no intent to commit hos-
tilities, or even a breach of the peace; or to disturb any rights, in
person or in property, of any subject of the lawful government of
Colombia.

But for the excursion to Rio Hacha, it is improbable that any sus-
picion would have attached to the voyage.   Coupled with that excur-
sion, however, the precautions against detention found in the charter,
and in the letters of instruction to the captain; the delay in filing the
supplementary manifest, which recited the shipment of arms and
military supplies taken on board at New York; and the false des-
tination of these supplies, stated in the supplemental manifest, to-
gether with the fact of the two passengers accompanying Capt. O'Brien,
under whose orders in respect to landing the supplies he was to act,
—all these things tended to give an appearance of illegality to the
voyage in its inception, which I am nevertheless fully satisfied it did
not possess.   The Rio Hacha incident, as I have said, was an after-
thought, into which Capt. O'Brien was himself deceived and misled.
When he discovered that the ship was used, and was sought to be still
further used, for treacherous and hostile purposes, his conduct, so far
as I can perceive, was praiseworthy and blameless, both in resisting

the troops, so far as possible, and in returning at once to Savanilla. No blame was attached to him by the prisoners. But even had he entered knowingly upon the Rio Hacha expedition as a hostile one, inasmuch as that expedition was clearly no part of the original intent of the voyage, it would not furnish any foundation for a forfeiture under our statute. The various other incidents of concealment and precaution to which I have referred, though wholly unnecessary in order to avoid arrest for any offense under our statute, were plainly prudent enough in relation to the danger that might be apprehended from the Colombian government; because that government, in case it should learn the fact of this shipment of arms, might endeavor to intercept them before arrival at Savanilla as contraband of war. This furnishes all needed explanation of the circumstances that I have referred to, and is in entire keeping with the purely commercial character of the voyage.

I find nothing, therefore, in the case authorizing any inferences to be drawn adverse to the entirely peaceable and commercial character of the adventure, as it was designed and planned when the vessel sailed from this port. The Rio Hacha excursion was an independent incident, during which Capt. O'Brien found himself surprised by the violent and treacherous acts of the troops, which he could not have anticipated, and which he did everything in his power to repair.

The libel should therefore be dismissed, and the vessel discharged from custody.